WILLIAM FREEMAN, Petitioner, *v.* SUPERIOR COURT OF PUERTO RICO, SAN JUAN PART, WILFRIDO ROBERTS, JUDGE, Respondent; HERBERT S. WERNER, ROBERT BERK, and CARIBLANTIC REALTY CORP., Interveners.

No. C-64–31.     Decided March 12, 1965.

2

*Morales & O'Connor* and *Francisco L. Acevedo Nogueras* for petitioner. *McConnell, Valdés & Kelley, Pablo R. Cancio,* and *Ramón Morán Loubriel* for interveners.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

The petition for certiorari in this case was filed in the morning of April 27, 1964. On that same date we issued a writ to review an order entered on the 21st of the same month, by the Superior Court, San Juan Part, designating a receiver, on plaintiff's motion, as well as the correctness and validity of the acts performed by said receiver under the aforesaid order.

The facts and circumstances of the case, as revealed by the record and considered pertinent by us in the disposition of this case, are the following:

On October 31, 1963, Mario Marcantoni and his wife Gladys Massanet, and Cariblantic Realty Corp., represented by its agent, Mr. Herbert Werner, subscribed a document drawn up in the English language in which the former agreed to sell a certain property to the latter for $793,650. To all purposes, Mr. and Mrs. Marcantoni were referred to throughout the document as "the sellers," and the corporation, as the "purchaser." The agreed purchase price would be paid as follows: (a) $135,000.00 in cash at the time of the execution of the deed of sale; (b) the amount of $96,-000.00 would be retained by the purchased to pay off two mortgages constituted upon the property and the mortgages would be assumed by the purchaser; (c) the remaining $562,650.00 would be paid in five consecutive annual instal-

ments of $112,530.00 each, the first one, two years and a day from the date of the execution of the deed of sale. The balance of the purchase price, bearing no interest, would be secured by a mortgage constituted by the purchaser in favor of the sellers.

The deed recites that, simultaneously with its execution, "the purchaser" had deposited in escrow with Mr. José Antonio Luiña the amount of $10,000.00 evidenced by check number 2797 dated September 21, 1963, drawn by William Freeman against the First National Bank of Farmingdale, N.Y. Said sum of $10,000.00 would be applied to the amount of $135,000.00 payable by "the purchaser" to the sellers at the time of the execution of the deed of sale and would be thus delivered by Mr. José Antonio Luiña simultaneously with the execution. In the event that "the purchaser" did not acquire the property, said amount would be returned to the purchaser, but if the latter failed to acquire the property after being bound thereto under the terms of the agreement, the said amount would be delivered to the sellers who would receive it by way of any and only liquidated damages and/or penalties to which they would be entitled by reason of the purchaser's failure to comply with the contract.

After agreeing on the facts and circumstances under which "the purchaser" would not be bound to purchase, as well as on other details, it was decided that the date for the execution of the deed of sale, transfer, and conveyance and of the mortgage to secure the deferred price, referred to in the agreement as "the date of closing," would be ninety days from the date of the agreement. The deed would be executed before a Notary Public at the place and date designated by "the purchaser," who would give the sellers ten days' advance notice. Notarial fees and payment for stamps and registration in the Registry of the Property in connection with both the sale and the mortgage would be borne equally by the sellers and the purchaser.

After other covenants and agreements, it was decided that upon the sole consideration of the payment of $135,-000.00 by "the purchaser" to the sellers at the date of closing and upon the execution of the deed of sale, the sellers would liberate, exclude, and release from the purchase money mortgage, or at any time thereafter on the purchaser's request, a 35-cuerda parcel of land whose location would be determined solely and exclusively by the purchaser. It was agreed that the purchaser would have the right to transfer or assign all or any part of its rights under the agreement to any person whatsoever, without incurring liability thereby or with relation thereto. Any deeds executed on the date of closing had to contain any and all provisions set forth in the agreement. The parties agreed that the document constituted a firm and binding agreement to buy and sell the property in question, *subject only to the conditions therein contained.* It was repeated that in the event that the purchaser failed to acquire, after being bound thereto under the terms of the agreement, the amount of $10,000.00 would become the property of the sellers as only liquidated damages and/or penalties. At the time of the execution of the deed of sale the sellers would fully pay unto the persons entitled thereto, the brokerage fee or commission to be paid by reason of their services amounting to 5% based upon the total purchase price. In the event that the purchaser did not acquire the property, the agreement would be deemed absolutely terminated, rescinded, and held for naught, without further liability between the parties, subject only to delivery unto the purchasers of the aforesaid amount of $10,000.00. This agreement, binding the heirs, successors, and assigns of the parties thereto, is signed by Mario Marcantoni and his wife Gladys Massanet Marcantoni, as sellers, and by Cariblantic Realty Corp., represented by Herbert Werner, as purchaser.

Mr. and Mrs. Marcantoni received a cable dated March 7, 1964, signed by William Freeman and Cariblantic Realty Corp., represented by William Freeman, advising them that William Freeman was the sole stockholder and principal officer of Cariblantic Realty Corp.; that the corporation was ready to take title to the property as per contract of October 31, 1963; that this was the ten-day notice called for in the contract, fixing March 18, 1964, as the date of closing, in the office of his attorney, José Luiña. Freeman informed that he would personally attend and that no one other than himself was authorized to act on behalf of Cariblantic; that Werner's authority was limited to making the contract and that Werner had no additional authority to act on behalf of Cariblantic and Freeman himself.

On March 13, 1964, Herbert S. Werner, Robert Berk, and Cariblantic Realty Corp., as plaintiffs, and claiming to be the sole stockholders of the corporation, filed a complaint against William Freeman, Mario Marcantoni and his wife Gladys Massanet, in the San Juan Part of the Superior Court. After referring to the document of October 31, 1963, and to many of its covenants, they alleged that the date of closing was April 28, 1964; that under the provisions of said contract, Cariblantic was bound to notify Mr. and Mrs. Marcantoni of the "date of closing" ten days in advance; that on March 7, 1964, codefendant William Freeman had advised husband and wife in a cable sent from New York City that he was the sole stockholder and principal officer of Cariblantic Realty Corp. and had given a ten-day notice for the date of closing, March 18, 1964, in Attorney José Antonio Luiña's office; that Freeman advised that he would attend as the only person authorized to act on behalf of the corporation; that William Freeman is neither a stockholder nor an officer of Cariblantic nor is he authorized by said corporation to act on its behalf in this or any other transaction; that on March 11, 1964, the Board of Directors

of Cariblantic had authorized Werner to give Mr. and Mrs. Marcantoni the required notice as to the time and place for the closing of the transaction, setting March 23, 1964, at 10 a.m. therefor in the law offices of McConnell, Valdés & Kelley; and that Werner sent codefendants Mr. and Mrs. Marcantoni the aforesaid notice in compliance with the resolution of the corporation.

A motion was made for the Court to enter judgment adjudicating and determining that the sole stockholders of Cariblantic Realty Corp. are coplaintiffs Herbert S. Werner and Robert Berk and that Freeman is neither a stockholder nor an officer of the corporation; determining that the only person legally authorized by the corporation to execute the aforesaid document together with codefendants Mr. and Mrs. Marcantoni was coplaintiff Herbert S. Werner, who was also the only person authorized to execute any necessary documents; determining that any past, present, or future action on the part of William Freeman on behalf of the corporation was altogether null and void; ordering Freeman to desist and abstain from taking any future action in his name or on behalf of the corporation with respect to the properties in question, or to enter into any kind of transaction, regardless of its nature, in connection with the properties involved in the litigation. Specific performance on the part of codefendants Mr. and Mrs. Marcantoni was demanded, and the Court was asked to determine that said codefendants were bound under the terms of the contract of October 31, 1963, to appear on Monday, March 23, 1964, at 10 a.m., in the law offices of McConnell, Valdés & Kelley to execute, as sellers, all necessary documents in order that Cariblantic Realty Corp., which would be "represented in said act solely by coplaintiff Herbert S. Werner," would acquire by purchase the properties involved in this litigation, all of it pursuant to the terms and conditions of the contract of October 31, 1963. The complaint is verified.

On March 15, 1964, two days after filing the complaint, the plaintiffs moved to secure the effectiveness of the judgment.[1] They alleged that, upon information believed by them to be true, they reasonably feared that Freeman intended to close the transaction in the morning of March 16, 1964; that if such were the case, the action filed would become academic and the plaintiffs would suffer irreparable damages; that they sought to secure the effectiveness of the judgment by means of an order addressed to each and every one of the defendants to desist and abstain from carrying out any transaction in connection with the lands involved in the action and from executing any document until further order of the Court. That the plaintiffs had no time to give a bond, were it to be required; that the order to be issued by the Court should remain in effect until March 18, 1964, at 2 p.m., provided that if on that date plaintiffs had failed to give a bond, it would become null and void, but if on that date plaintiffs had given a bond, the order would remain in effect until further order of the Court. That plaintiffs would sustain irreparable damage and loss before a hearing on this application. Affidavits in support of the motion were attached thereto.

On that same date, March 15, 1964, the San Juan Part of the Superior Court entered against Freeman and Mr. and Mrs. Marcantoni, without a hearing, the following order:

"In consideration of the Motion to Secure the Effectiveness of the Judgment filed by plaintiffs on even date herewith; in consideration of the allegations contained in the verified complaint; and in consideration of the affidavits attached to and made a part of Motion A and B, the Court hereby grants plaintiffs' request and, consequently, it orders defendant William Freeman, also known as William P. Frieman, William P. Freeman, and William Patrick Freenan, and codefendants Mario Marcantoni and his wife Gladys Massanet Marcantoni, to desist and abstain from:

---

[1] The filing stamp on the motion reads March 15, a Sunday.

"(i) carrying out the closing of the transactions of purchase and sale of the property referred to in the complaint filed in this case;

"(ii) carrying out any kind of transaction among themselves or through any corporation, entity, or third person, with respect to the properties referred to in the complaint filed in this case.

"This order shall remain in effect until March 18, 1964, at 2:00 p.m., provided that if on such date and time plaintiffs have given a bond in the amount of $10,000.00 to secure all damages caused to defendants, this order shall then remain in full force and effect until further order of the Court; provided, furthermore, that if on such date and time plaintiffs have failed to give the aforesaid bond, this order shall then become null and void on the aforesaid date of March 18, 1964, at 2:00 p.m.

"Each one of the defendants is hereby advised to comply strictly with the provisions hereof under pain of contempt of Court.

"ISSUED in San Juan, Puerto Rico, this 15th day of March 1964."

This order was served thus:

"CERTIFICATE OF MARSHAL'S EXECUTION OF SERVICE

"I CERTIFY:

"That on Monday, March 16, 1964, at 12:05 a.m., I received the foregoing order and at 12:50 a.m. I notified codefendant Mr. William Freeman personally, delivering to him, at the San Juan Hotel, San Juan, Puerto Rico, a copy of the Motion, a copy of the exhibits, and a copy in English and in Spanish of the aforesaid order, giving Mr. Freeman all the warnings contained therein.

"I further certify that at 1:40 o'clock this same morning I personally served a copy of the aforesaid order upon codefendant Mario Marcantoni, delivering it to him in his residence at 'El Palmar,' Isla Verde, also warning him on the contents thereof.

"San Juan, P.R., this 16th day of March 1964.

(s) Luis F. Rivero Otero
General Marshal"

Defendant William Freeman was served with the complaint on March 16, 1964, at 12:50 a.m., in San Juan. On March 18, he appeared in Court in connection with the order and alleged that on account of the order to secure the effectiveness of the judgment, a transaction involving the amount of $793,650.00 had been held back through a bond of only $10,000.00; that this might cause him damages amounting to $600,000.00 and he prayed that the amount of the bond be increased to that amount. He invoked his right to a hearing as to the restraining order and as to the bond. At the same time, referring to plaintiffs' demand that March 23, 1964, be set as the date of closing, Freeman asked the Court for a restraining order to prevent codefendants husband and wife also from attending said act.

On April 8, 1964, Freeman filed another motion insisting on his right to a bond in an amount in excess of $10,000.00 in consideration of the damages he might suffer on account of the restraining order, insisting that the order had been issued without hearing him and asking that the order and his Motion of March 19, be heard as soon as possible. On that same date, April 8, 1964, Freeman answered the complaint and filed a counterclaim.

At that point and while the restraining order above copied was in effect, on April 14, 1964, the plaintiffs filed a petition for the appointment of a receiver. They alleged that pursuant to the contract of October 31, 1963, the last day to close the transaction was April 28, 1964; "codefendants Mario Marcantoni and Gladys Massanet Marcantoni would be released of their obligation to sell the properties in question to coplaintiff Cariblantic Realty Corp. if the transaction is not closed on or before April 28, 1964, as aforesaid." That according to the verified complaint, coplaintiff Werner had given proper notice to codefendants Marcantoni and his wife of the closing of the transaction

on Monday, March 23, 1964, in the law offices of McConnell, Valdés & Kelley and that on March 20, 1964, the aforesaid codefendants, Mr. and Mrs. Marcantoni, had given written notice to the effect that they would not be present at the function scheduled for the 23d, on the ground that the case was before the consideration of the court and several persons and entities were claiming the right to acquire the properties in question. That once the matter had been settled by the Court, if the option were still valid, as being within the expiration period and upon compliance with all the requirements involved in the option on the part of the person or entity favored by the Court, they would not object to the signing of the deeds on the designated date and time. Plaintiffs alleged that if "the closing of the transaction" did not take place on or before April 28, 1964, codefendants Mario Marcantoni and his wife "would be released of their obligation to sell the properties in question to plaintiff Cariblantic Realty Corp., and plaintiffs would suffer irreparable damage and loss," and the action would be academic.[2] They alleged that plaintiffs had in their possession the money needed to acquire the properties and to pay the selling price to the defendants Mr. and Mrs. Marcantoni. For these reasons they asked for the appointment of a receiver and suggested Mr. Roberto J. Matos for appointment, (1) to designate and to notify codefendants Mr. and Mrs. Marcantoni of the date, time, and place to close the transaction; (2) to appear on said date, time, and place on behalf and in representation of Cariblantic Realty Corp. to execute any necessary documents "in order to consummate the transaction contemplated in the Option to Sell Contract of October 31, 1963," in agreement with the terms and covenants of the aforesaid contract; (3) to receive, on behalf and in

---

[2] The statements of codefendants husband and wife above referred to are contained in a letter signed by Alejandro Corchado, addressed to Counsel McConnell, Valdés & Kelley.

representation of Cariblantic, "from the hands of codefendants Herbert R. Werner and Robert Berk and to pay to the Marcantoni-Massanet spouses the amount of $135,000.00 to be delivered at the time of the execution to the sellers, and to receive from said coplaintiffs and disburse any additional necessary sum "for the execution and registration of the proper documents"; (4) to designate a notary for the drafting and execution of the necessary documents to close the transaction; (5) to take possession of, retain, and look after the properties to be acquired in the transaction, all of it subject to further order of the Court, it being understood that the aforesaid properties would remain in "custodia legis" subject to further determination by the Court with respect thereto; (6) to take any other necessary steps "in order to consummate the transaction in question," on behalf and in representation of Cariblantic Realty Corp. Plaintiffs moved for an order directing Mr. and Mrs. Marcantoni to take the following action: (1) to appear together on the date, time, and place designated and notified by the receiver and to execute any necessary documents to consummate the transaction pursuant to "the Option to Sell Contract of October 31, 1963"; (2) to receive at such time the sum of $135,000.00 from the hands of the receiver as down payment for the sale of the properties and to acquire simultaneously a purchase money mortgage, and to take any other necessary and convenient steps "for acquisition of the properties by Cariblantic Realty Corp. through the Receiver." It was requested that the plaintiffs and receiver be dispensed from giving a bond.

Freeman objected to the motion for the appointment of a receiver and to the order addressed to Mr. and Mrs. Marcantoni to appear to execute the deed, alleging that it would be tantamount to deciding in plaintiffs' favor without hearing the case on the merits and on the sole allegation that they had certain rights in Cariblantic Corporation. He al-

leged that on March 13, 1964, he had signed a document transferring his and Cariblantic's rights in favor of Fredic H. Gould who had acquired such rights on behalf and in representation of Gould Properties, Inc., for which reason at that time Cariblantic no longer owned the option contract, and that if the Court ordered the transfer of the property to any person other than the present owners of the option contract (Fredic H. Gould), Freeman would be subjected thereby to an action for damages on the part of the owner of the option. He alleged that ever since the complaint had been filed on March 13, 1964, he had urged the Court to give him the opportunity of being heard, without having been given such opportunity up to that date; that the $10,000.00 bond given by plaintiffs was inadequate in the light of the damages he might suffer by reason of the restraining order, in view of the fact that the transaction involved $793,650.00; that the situation of the case did not justify in law the appointment of a receiver and that co-plaintiff Werner is Freeman's nephew and was commissioned by him to appear in the option contract solely as Cariblantic's agent as disclosed by the contract itself, from which it does not appear that Werner was either an officer or a stockholder of the corporation.

The motion for the appointment of a receiver was heard in the afternoon of April 20, 1964. The next day, April 21, the receivership was ordered as follows:

"ORDER

"In consideration of the Petition for the Appointment of a Receiver filed by plaintiffs, the Court set April 20, 1964, at 2:00 p.m., to hear the parties in connection therewith.

"At the hearing, plaintiffs appeared through counsel, and defendant, William Freeman, through his counsel. Codefendant Mario Marcantoni was also present. After hearing the parties, the Court has decided to grant, and it hereby grants, plaintiffs' Petition for the Appointment of a Receiver.

"Consequently, the Court designates Attorney Roberto J. Matos as Receiver, in order that, as an officer of this Court, he shall take the following action:

"i) To designate and to notify codefendants Mario Marcantoni and his wife Gladys Massanet Marcantoni, of the date, time, and place to close the transaction of sale and constitution of mortgage contemplated in the Option to Sell Contract dated October 31, 1963 (Exhibit B of the complaint).

"ii) To appear on said date, time, and place on behalf and in representation of Cariblantic Realty Corp. to execute whichever documents may be necessary in order to consummate the transaction contemplated in the aforesaid Option to Sell Contract dated October 31, 1963, in accordance with the periods, terms, covenants, and conditions agreed to in said contract.

"iii) To receive on behalf and in representation of Cariblantic Realty Corp. from the hands of coplaintiffs Herbert S. Werner and Robert Berk and to pay to the Marcantoni-Massanet spouses the sum of $135,000.00, or any other amount that, pursuant to the terms of the Option to Sell Contract, must be delivered at the time of the execution of the documents to the aforesaid spouses, as sellers; and to receive from the hands of said plaintiffs and to disburse any additional necessary sum for the execution and recordation of the proper documents.

"iv) To designate a notary for the drafting and execution of the necessary documents for the closing of the transaction.

"v) To take possession of, retain, and look after the properties to be acquired in said transaction, all of it subject to further order of the Court; it being understood that the aforesaid properties shall remain in 'custodia legis' subject to any further determination deemed proper by this Court with respect thereto.

"vi) To take any other necessary or convenient steps in order to consummate the transaction in question, on behalf and in representation of Cariblantic Realty Corp.

"Codefendants Mario Marcantoni and Gladys Massanet Marcantoni are ordered to take, without any pretext whatever, the following action:

"i) To appear together on the date, time, and place designated and notified to them by the Receiver in order to execute and to execute any necessary documents to consummate the transaction contemplated in the Option to Sell Contract of

October 31, 1963 (Exhibit B of the complaint) in accordance with the terms, covenants, and conditions agreed to in said contract.

"ii) To receive at that time, from the hands of the Receiver, the sum of $135,000.00 or any other amount which, according to the terms of the contract, they must receive as down payment for the properties in question; and to acquire simultaneously a purchase money mortgage, all of it as stipulated in the afore-said Option to Sell Contract executed on October 31, 1963.

"iii) To take any other action, either necessary or conven-ient, for acquisition of the properties in question by Cariblantic Realty Corp., through the Receiver, pursuant to the stipulations of the Option to Sell Contract dated October 31, 1963.

"It is expressly provided that, should codefendants Mario Marcantoni and his wife Gladys Massanet Marcantoni refuse to convey the properties in question in the manner above pro-vided, the conveyance shall be carried out on the date, time, and place designated by the Receiver, by the Marshal of this Court, who is hereby authorized to make said conveyance on behalf and in representation of the sellers, Mario Marcantoni and his wife Gladys Massanet Marcantoni, all of it pursuant to the terms, clauses, covenants, and conditions of the Option to Sell Contract.

"It is expressly provided that the conveyance of the proper-ties on behalf of Cariblantic Realty Corp. hereby ordered, shall be subject to any right established before the Court by any third party who may have validly acquired, by assignment on the part of Cariblantic Realty Corp., the latter's rights with respect to the Option to Sell Contract of October 31, 1963. If this Court should determine after hearing the parties that a particular third party acquired the rights of Cariblantic Realty Corp. in the aforesaid Option to Sell Contract, the Court shall then order the Receiver to convey the aforesaid properties to such third party, and the Court shall take whichever additional measures may be proper in law for the protection of the parties and the final disposition of the case.

"The Court has required plaintiffs to give a bond in the sum of Twenty Thousand Dollars ($20,000.00) to secure all the damages caused to defendants by reason of this Order to Secure the Effectiveness of the Judgment, if it were finally decided that it did not lie, and the aforesaid bond has been

given by plaintiffs and approved by this Court, on even date herewith. Inasmuch as plaintiffs have complied with said requirement and inasmuch as Attorney Roberto J. Matos has filed his acceptance of the appointment as Receiver, this Order shall take effect forthwith.

"San Juan, P. R., April 21, 1964."

On April 28, 1964, codefendants Mr. and Mrs. Marcantoni appeared through Attorney G. Meléndez Carrucini and alleged that on April 21,[3] the Receiver, Attorney Roberto J. Matos, had asked them by means of a communication to appear on Friday, April 24, to execute the aforesaid contract of sale; "that in view of the haste with which codefendants had been summoned," codefendants requested the Receiver to postpone the execution another day, that is, for Saturday, April 25, "in order that codefendants could have sufficient time to study and examine the deed before its execution"; that the Receiver refused and insisted that the execution take place on April 24, 1964, at 4:00 o'clock in the afternoon; "that it was not until Friday, April 24, at 1:00 o'clock in the afternoon that the final copy of the aforesaid document was left in the office of codefendants' accountant, Mr. Alejandro Corchado"; that in the night of April 23, they received a telegram from Freeman's counsel informing that he had filed an appeal and a petition for review in the Supreme Court in connection with the order of April 21 and advising them not to sign any document of conveyance; that on April 22, 1964, they had been served with a complaint filed against them by Fredic Realty Corporation, wherein the latter claimed to be the owner (assignee) of the option to purchase the property; that in view of the foregoing the codefendants husband and wife were confused and had serious doubts as to the action they should take without incurring liability and lacked sufficient time to examine the

---

[3] As disclosed by the record, the $20,000.00 bond required was approved April 22, a day later.

situation. That in view of the provision to the effect that the Marshal would act on behalf of codefendants, they refused to sign the aforesaid document of conveyance, though not intending to ignore the order of the Court of April 21.

On that same date, April 28, a report from the Receiver was filed concerning a conference with Marcantoni and his counsel and counsel for plaintiffs on April 23, 1964. That after explaining to them the purpose of the receivership and discussing the proposed deed, he informed them that it would be signed the following day at five o'clock in the afternoon; that counsel for the codefendants, husband and wife, told him that if he was sent a copy of the deed that same night, he would be willing to attend the execution; that on Friday, April 24, he went to the office of plaintiffs' counsel at three o'clock in the afternoon for the execution; that he waited for the spouses until 6:00 p.m. and the latter did not appear; he was informed of their doubts concerning the telegram received from Freeman's counsel appealing from the order; that subsequently Mr. Marcantoni, accompanied by Mr. Corchado, went to the office and said that he could not sign the deed and that on the telephone, Attorney Meléndez, counsel for the spouses, informed him that his clients would not sign the documents until Monday, at which time they intended to ask the Superior Court for relief; that his intention was to protect the interests of his clients, Mr. and Mrs. Marcantoni, in connection with the effects of a telegram received by them; that said telegram was discussed; that when Attorney Meléndez insisted in not signing the documents until after seeking relief from the Court, the Receiver told him that he would proceed with the execution and that he would not wait for the spouses to ask the Court for relief; that Mr. Marcantoni reiterated his intention not to sign and withdrew himself, whereupon the deed was executed by the Marshal on his behalf. There is a telegram in the record, sent by Attorney Celestino Morales, dated April 23, 1964, to the Re-

ceiver, informing him that Freeman had filed an appeal and a petition for certiorari in the Supreme Court and, under those circumstances, he challenged the Receiver's authority to act at all.

The aforesaid deed was executed that same April 24, at 11:50 p.m., in San Juan, before Notary Public Ramón Morán Loubriel, and by order of the Court the Marshal of the latter assumed Mr. and Mrs. Marcantoni's representation, as sellers, and Cariblantic Realty Corp., as purchaser, represented by the Receiver. Among the clauses and conditions it was set forth that the sale was being made for $793,650.00; that at that moment the purchaser paid to the sellers the amount of $58,281.38 which was delivered to the Marshal to be deposited in Court; that the purchaser, "upon request of the Sellers," retained in his possession the amount of $37,125.00 to pay brokers' fees or commission; that the purchaser, "upon request of the Sellers," retained the amount of $30,000.00 in order to pay off at the proper time certain mortgages in favor of the Puerto Rico Production Credit Association; and the purchaser retained other amounts: $1,500.00 to pay the difference in a mortgage; $1,713.00 to pay the insurance premium of title to the properties; $4,922.87, one half of the internal-revenue stamps and expenses incurred in connection with the deed, its recordation in the Registry, and attorney's fees; $206.75 as attorney's fees for the cancellation of two mortgages; $551.00 internal-revenue stamps and attorney's fees for the cancellation of certain leases and $700.00 to pay property taxes. The sellers appear as accepting the down payment of $135,000.00 as described, and executing a release therefor. The purchaser retained $96,-000.00 to release certain encumbrances and it was provided that the difference up to $562,650.00 would be paid in five consecutive annual installments of $112,530.00 principal each.

In the same deed the purchaser constituted a purchase money mortgage.[4]

From this deed it appears that title was obtained by Cariblantic Realty Corp. represented by the Receiver, not by the Receiver. For this reason the Receiver neither took nor could he take possession of the property in order to keep it in *custodia legis* and after executing the deed, there was apparently no other action or measure he could take as such Receiver.

Dated April 24, and personally served on that date, but stamped April 27,[5] a notice of appeal from the order appointing the Receiver was filed by Freeman.

On April 27, Freeman filed in this Court a petition for certiorari to review the order decreeing the receivership. That same day, April 27, 1964, the Court issued a writ of certiorari and an order in aid of its jurisdiction suspending the effects of the order of April 21, 1964 designating a Receiver, until further order of the Court. When this order was issued on Monday, April 27, the aforesaid deed had already been executed on Friday night, April 24.[6]

Petitioner challenges the validity of the order of April 21, 1964, appointing a Receiver and, consequently, all of the latter's actions. He claims that (1) the facts alleged in the complaint neither justify nor lead to the appointment of a receiver as done by the trial court; (2) that the latter committed an error in the exercise of its discretion in connection with the appointment, assuming that it had authority to

---

[4] See the situation according to the contract, above all the $30,000.00 of that mortgage and the $135,000.00.

[5] The document was stamped twice, once, April 27, and another, May 4.

[6] A certified copy of the deed of sale and mortgage was presented—also prior to that order—for registration purposes in the Registry of the Property. On July 3, 1964, we were asked in this case to order the Registrar to refuse registration or to abstain from recording pending decision of this case. Subsequently, of applicants' own will, the document was withdrawn from the Registry, unrecorded.

do so, in failing to make any provision for his own and others' protection, and in fixing an insufficient bond to secure any damages he might suffer.

On their part, interveners claim that (1) from the verified complaint and other pleadings their right to the relief obtained was clear; (2) there existed a genuine issue with respect to who was or were entitled to acquire title to the real properties involved in the action; (3) no other temporary remedy, except the receivership ordered, would have been effective to secure the effectiveness of the judgment; (4) petitioner, as well as third parties, were duly protected; and (5) that the order of March 15, 1964, in connection with the first attempt to secure the effectiveness of the judgment, was correctly issued.

After a thorough analysis of the unusual attendant circumstances from the time of the execution of the option to sell agreement dated October 31, 1963, until the time of the execution of the final deed of sale and constitution of mortgage of April 24, 1964, we hold that petitioner William Freeman is entirely correct in this case and that the order sought to be reviewed, dated April 21, 1964, issued in the main litigation, appointing Roberto Matos as Receiver, lacks validity, legality, adequacy, and juridical efficacy and is altogether null and void and, of course, each and every one of the actions, agreements, and contracts entered into or executed by such receiver, are altogether worthless, illegal, inefficacious, and void, especially the contract of sale and constitution of mortgage legalized by deed No. five, on April 24, 1964, before Notary Public Ramón Morán Loubriel, in this city of San Juan. Hereinbelow we set forth the main grounds for our determination.

On April 21, 1964, in the Superior Court, San Juan Part, in civil case No. 64-1052, a judicial issue had been duly joined between Herbert S. Werner and Robert Berk, as plaintiffs, and William Freeman, as defendant, and it was

pending discussion and decision on its merits. Using the words of interveners herein—p. 21, brief—". . . an issue as to who Cariblantic Realty Corp. is, that is, whether it is a corporation whose only stockholder and owner is petitioner Freeman or whether it is a corporation whose sole stockholders and owners are interveners Werner and Berk . . . a genuine issue as to who was or were entitled to acquire title to the property in question."

Two days after the complaint had been filed, that is, March 15, 1964, on plaintiffs' motion, an order was issued to secure the effectiveness of the judgment that might be entered in their favor. We have copied that order verbatim at the preceding pp. 8 and 9. By virtue thereof, defendants William P. Freeman and the Marcantoni-Massanet spouses were ordered

". . . to desist and abstain from:

"i) carrying out the closing of the transactions of purchase and sale of the property referred to in the complaint filed in this case;

"ii) carrying out any kind of transaction among themselves or through any corporation, entity, or third person, with respect to the properties referred to in the complaint filed in this case."

The motion was submitted to the consideration of a Superior Judge, in his home, at midnight, on Sunday, March 15. It was signed right there by the magistrate and at 12:50 a.m. it was served on Freeman by a Marshal, and at fifty minutes past one o'clock, that same morning, on codefendant Marcantoni, both of whom were given "all the warnings contained therein."

■ The effectiveness decreed constitutes or operates as a prohibition to alienate, which is authorized, as a temporary remedy, by Rules 56.1 and 56.4 of the Rules of Civil Procedure, 1958. From the moment defendants in that case were served with the order, early in the morning of March 16, all dispositive proprietary rights of codefendants husband

and wife to "enter into any sort of transaction . . . with respect to the properties referred to in the complaint," were judicially interdicted and Freeman's acquisitive right in connection with those properties was likewise enjoined. Thus, the effectiveness of any judgment entered in that action in favor of Werner and Berk was effectively and firmly secured, inasmuch as those properties, pending the litigation and a final determination as to who was or were the only stockholders, owners, and officers of Cariblantic Realty Corp., were isolated and out of circulation and traffic as real properties.

At that stage of the proceedings, while the case was pending trial on its merits and defendants were hand tied and estopped from entering into "any kind of transaction . . . with respect to the properties . . . ," the trial court lacked judicial authority or power to appoint, on plaintiffs' motion, a receiver for the main purpose, among others of lesser significance, of obliging the owners of the properties, by judicial fiat, *"to close the transaction of sale and constitution of mortgage contemplated in the Option to Sell Contract* dated October 11, 1963"; to execute any necessary documents in order *"to consummate the transaction contemplated* in the aforesaid contract . . . in agreement with the periods, terms, covenants, and conditions agreed to in said contract"; to receive "from the hands of coplaintiffs Herbert S. Werner and Robert Berk the sum of $135,000.00 . . . as sellers; and to receive from the hands of said plaintiffs and disburse any additional necessary sum *for the execution and recordation of the proper documents"*; and for the purpose that the receiver could take any other necessary or convenient action *in order to consummate the transaction in question* and, in short, so that on the refusal of the codefendants husband and wife, the receiver could carry out the *conveyance,* together with the Marshal, *"in agreement with the terms,*

*covenants, and conditions of the Option to Sell Contract."*

Through the exercise of such drastic and extraordinary powers, at an interlocutory period, the final judgment, which in due time, and after the indispensable legal procedures, could have been entered in favor of plaintiff, was practically executed in advance or untimely on the night of April 24, 1964. There was nothing preventive or temporary in the remedy thus granted and applied. Through the appointment of a receiver, the untimely specific compliance of an option to sell contract was actually achieved, favoring a litigant whose rights were under discussion.

The apparent protection, in the guise of a condition, contained in the next to the last paragraph of the order in favor of "any third party who may have validly acquired, by assignment on the part of Cariblantic Realty Corp., the latter's rights with respect to the contract," may mean that the intended conveyance *to consummate the agreement* would be binding, final, and definitive as to the litigants and, on the other hand, it operated in two directions: it opened the doors to "third parties" to whom Werner and Berk, who claim to be the sole *owners* of the corporation, might assign such rights.

Rule 56 of the Rules of Civil Procedure, 1958, deals with Temporary Remedies and substituted the Act to Secure the Effectiveness of Judgments of 1902. The first sentence of subdivision 56.1 provides as a general principle in that connection: "In every action, before or after entering judgment, on motion of the claimant, *the court may make such temporary order as may be necessary to secure the effectiveness of the judgment."* (Italics ours.) Among such temporary orders, as provided in the rest of that Rule, the court may order the attachment, the prohibition to alienate, a receivership, and make an order to do or desist from doing any specific act.

The juridical basis or ground of these preventive or temporary measures—which operate mainly as an effective estopping, prohibition, or impediment to exercise a specific activity or power which, save for such bar, would be exercised freely—arises from the rules of juridical and moral conduct contained in §§ 1044, 1066, 1210, 1230, and 1811 of our Civil Code,[7] which constitute the principle of the correlative responsibility of debtors—*in its ample sense*— to pay their debts, certain and determined, due or adjustable, demandable because they are owing and current or outstanding, it having been said that a debtor is not thereby deprived of his properties or of something of his own, but that the latter belong to his creditors.

Notwithstanding the clear right to seek and obtain these necessary temporary remedies merely intended to guarantee and secure the effectiveness of or compliance with the final judgment that may ultimately be obtained, such orders, as we have said, may practically constitute, although temporarily or provisionally, among other things: a procedural expropriation without due compensation for the properties

---

[7] These sections provide:

"Obligations arising from contracts have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations." Civil Code, 1930, § 1044.

"Every obligation, the fulfilment of which should not depend upon a future or uncertain event or upon a past event, unknown to the parties in interest, shall be immediately demandable.

"Every obligation, containing a condition subsequent, shall also be demandable without prejudice to the effect of the performance." Civil Code, 1930, § 1066.

"Contracts are perfected by mere consent, and from that time they are binding, not only with regard to the fulfilment of what has been expressly stipulated, but also with regard to all the consequences which, according to their character, are in accordance with good faith, use, and law." Civil Code, 1930, § 1210.

"Contracts shall be binding, whatever may be the form in which they may have been executed, provided the essential conditions required for their validity exist." Civil Code, 1930, § 1230.

"A debtor is liable for the fulfilment of his obligations with all his present and future property." Civil Code, 1930, § 1811.

and rights of the debtor, a judicial mortgage, an absolute limitation of the right of free disposal, and a decrease in value of the properties involved.

█ Against such serious financial consequences, Rule 56.1 establishes certain general principles with respect to the granting of provisional remedies. It gives the court discretion to grant or refuse them; to grant them, it fixes certain guides: (1) they must be temporary; (2) they must be intended to secure the effectiveness of the judgment that may be entered in due time, and (3) the *interests of all the parties* must be considered as substantial justice and the circumstances of the case may require.

As a true and pure temporary remedy intended for protection and security, it does not seem to have been either requested or granted. It was, so that the Receiver could execute "any necessary documents in order *to consummate the transaction contemplated in the aforesaid contract* of option to sell . . . in agreement with the periods, terms, covenants, and conditions agreed to in said contract," with money to be received "from the hands of coplaintiffs Herbert S. Werner and Robert Berk" and which, in part, would be paid to the Marcantoni-Massanet spouses. The latter, especially, were obliged, ordered, and required to execute in conjunction with the Receiver "any necessary documents in order *to consummate the transaction contemplated* . . . in agreement with the terms, covenants, and conditions agreed to in said contract," and to take any other action "either necessary or convenient for the acquisition of the property in question by Cariblantic Realty Corp., through the Receiver, in agreement with the stipulation of the Option to Sell Contract . . . ." They were required to participate in a mission reserved for proceedings to execute the judgment prayed for in the complaint. The purchase of the properties ·of the defendants, husband and wife, with Werner's and Berk's money was

considered so final that it was sought to be recorded in the Registry of the Property.

The word "consummate" is defined, in its legal sense, as: "To comply with a contract or other juridical act already perfect." In his Language Encyclopedia, Martín Alonso stated that "consummation" is the total extinction and end, and that "to consummate" is "to carry to the utmost extent or degree."

The consummation decreed here was more damaging and prejudicial for defendants when, after. comparing the Option to Sell Contract of October 1963, with the deed of sale and mortgage executed by the Receiver, it becomes clearly apparent that the deed was not executed strictly "in agreement with the terms, covenants, and conditions agreed to" in the Option to Sell Contract. In the statement of facts set forth at the beginning hereof, we pointed out several points in conflict.

■ The appointment of a Receiver as a temporary remedy is specifically conditioned upon and subject to a showing that "no other temporary remedy would be effective to secure the effectiveness of the judgment," as provided by the first sentence of Rule 56.6.

We have already said that two days after commencing the litigation, plaintiffs prayed for "an order to secure the effectiveness of the judgment that may be entered for plaintiffs," and that the order was issued on March 15, 1964, instructing defendants to desist and abstain from "carrying into effect the closing of the transactions of purchase and sale of the property referred to in the complaint filed in this case" and "carrying into effect any kind of transaction among themselves or through any corporation, entity, or third person, with respect to the properties referred to in the complaint filed in this case." The Marshal served copies of the order on Freeman and Mr. Marcantoni personally, giving them "all the warnings contained therein."

Thereafter, in order to secure and guarantee the effectiveness of the judgment that might be entered for plaintiffs, the appointment of a Receiver was not proper.

In the light of the scope of the remedy originally granted to secure the effectiveness of the judgment, it was a poor pretext or excuse to allege, in order to obtain the appointment of a Receiver, that "if the transaction were not closed on or before April 28, 1964, the 'sellers' . . . would be released of their obligation to sell to the plaintiff corporation . . . and plaintiffs would suffer serious and irreparable damage, and the present action brought by plaintiffs would be academic." In the first place, because Freeman on one side and Werner and Berk on the other, had timely required the promising husband and wife to close the sale as agreed to, and although it is true that they could not legally make two consecutive and valid conveyances of the same thing, one of the two notices had to be valid and effective; and in the second place, because if after receiving such notices the remedy had been granted, ordering them to desist and abstain from closing the transaction of purchase and sale, any closing to the contrary would have been useless, of no value, and inefficacious, and the right to the closing would have remained, of course, outstanding and in full force during the time the prohibition or restraint was in effect. In other words, the term fixed for the closing by judicial intervention, did not continue to run, nor could it expire, wherefore the codefendants, husband and wife, were not released of their obligation to sell.

Pursuant to the terms of the complaint, the primitive security constituted, and still constitutes, the most appropriate or adequate temporary remedy. It curbed, we repeat, every dispositive power of the Marcantoni-Massanet spouses over their valuable properties whose exclusive acquisition is being disputed among these real estate brokers, each of whom

alleges to be the only owner, officer, official, and legitimate representative of the corporation favored by the option.

In the comments to Rule 56.1 of the Advisory Committee of the Rules of Civil Procedure, 1958, it says, among other things:

"As may be seen, that Act, although limiting in this provision the cases in which the remedy was granted, did not prescribe specific measures when the remedy was appropriate. In our proposed text the remedy may be ordered in any case, and the action taken is that one which, on motion of a party, is deemed by the court to be necessary or convenient to secure the outcome of the suit according to the terms of the claim. It is obvious that if a plaintiff seeks something specific, the most adequate remedy is the prohibition to alienate or encumber. But it is possible for circumstances to arise in a suit that would justify other measures. Such is the case with any other obligation compliance with which is sought.

"Consequently, the proposed text details the specific remedies of security contained in the Act to Secure the Effectiveness of Judgments as well as in other legal provisions without connecting them to the nature of the claim involved, and the court is authorized to take not only the actions listed, but also any others which, according to the circumstances of the litigation, may be justified. In obvious cases the court shall apply the recognized and traditional remedies and in controversial cases, litigants shall discuss the controversy in terms of the fairness and unfairness, adequacy or inadequacy of the remedy according to the special circumstances of the litigation and not in terms of whether the law authorizes such or such a remedy in relation to the nature of the obligation claimed.

"In order to cover the general principles of the proposed text, the rule by which the court must abide when considering the method of securing effectiveness, has been included therein. This rule has been laid down by our Supreme Court in *National City Bank of N. Y.* v. *De la Torre,* 45 P.R.R. 609; *Carlo* v. *District Court,* 58 P.R.R. 889; and *Paz* v. *Bonet,* 31 P.R.R. 64. Claimant must be given security, but defendant must not be oppressed or caused unnecessary hardships in his business."

We thus see that the appointment of a receiver, as a temporary remedy, is relegated to the category of a heroic measure. It shall only be granted in extreme cases, that is, when *it is shown* "that no other temporary remedy would be effective to secure the effectiveness of the judgment."

██ The authority to appoint a receiver, although discretionary, is not arbitrary, it is very delicate and must be exercised with extreme caution, when extraordinary circumstances require summary relief, where it is absolutely necessary to protect the interests in litigation. As a general rule, properties in the owner's hands shall not be placed, not even at his own request, in the hands of a receiver. It must be shown that there is actually an imminent danger of the properties in litigation being lost, damaged, or destroyed, in order that they may be handed to a receiver as the best remedy to protect them and after exhausting all other applicable temporary remedies. This power must not be exercised in a doubtful case or when it is likely to cause injustice or the impairment of private rights. The appointment of a receiver is a means, not an end.[8]

██ When applying these temporary remedies in the light of our procedural rules, the court must not forget that said rules must be construed to secure the just, speedy, and inexpensive determination of every action.[9]

---

[8] See: *Heirs of de Jesús* v. *District Court*, 65 P.R.R. 1 (1945); *Ramírez* v. *District Court*, 64 P.R.R. 507 (1945); *Valiente* v. *Registrar*, 63 P.R.R. 143 (1944); *Rodríguez* v. *District Court*, 59 D.P.R. 650 (1942); *United P.R. Bank* v. *District Court*, 44 P.R.R. 826 (1933); *P.R. Racing Corp.* v. *District Court*, 32 P.R.R. 800 (1924); *Schluter* v. *Texidor, District Judge*, 26 P.R.R. 97 (1918); *Balasquide* v. *Rossy*, 18 P.R.R. 33 (1912).

[9] In 1937, when Senator Borah was asking Congress to approve a certain bill and referred to receivership cases, he used the following words which Moore reproduces at p. 1916 of Volume 7 of his classical work, in the Senator's own language:

"We have found out through investigation that the heart of the misdoings with reference to· receivership cases was that attorneys get together and agree upon large fees, agree upon a receiver, agree upon

■ What we have said does not mean that, once a temporary remedy of another nature to secure the effectiveness of the judgment has been granted, a receiver may not be appointed for the same purpose. When, as provided in Rule 56.6, it is shown that the remedy granted would not be effective to secure the effectiveness of the judgment, the appointment may be requested. *Ramírez* v. *District Court,* *supra,* gives us a clear example thereof. In it, the attendant extraordinary circumstances demanded with the greatest urgency, as a heroic and extreme remedy, the immediate appointment of a receiver, notwithstanding that an attachment had been levied, for the latter was altogether ineffective.

The order will be vacated.

Mr. Justice Belaval dissented in separate opinion.

—O—

MR. JUSTICE BELAVAL, dissenting.

San Juan, Puerto Rico, March 12, 1965

Cariblantic Realty Corp., a juridical person organized and existing under the laws of the Commonwealth of Puerto Rico, and certain persons who allege to be its sole stockholders, to wit, coplaintiffs Herbert S. Werner and Robert Berk, filed in the Superior Court of Puerto Rico, San Juan Part, a civil action against a person who also alleges to be the only stockholder of Cariblantic Realty Corp., William Freeman, and the spouses Mario Marcantoni and Gladys Massanet Marcantoni, who had entered into a contract binding themselves to sell to Cariblantic Realty Corp. certain properties owned by them, located in the Municipality of Canóvanas. In that action they prayed the San Juan Part to hold that the only stockholders of coplaintiff Cariblantic

---

receivers' fees, agree upon the compensation of all parties concerned, and the result is that they simply divide up the carcass and there is nothing left for creditors or anybody else."

Realty Corp. were coplaintiffs Herbert S. Werner and Robert Berk, and, in addition, to determine that codefendant William Freeman was neither a stockholder nor an officer of coplaintiff Cariblantic Realty Corp.

The need for such judicial determination arose from a clause of the contract entered into on October 31, 1963, between Mr. and Mrs. Marcantoni and the agent of coplaintiff Cariblantic Realty Corp., also a coplaintiff, Herbert S. Werner, in which it was agreed that the deed of sale closing the business would be signed on January 29, 1964, which date was subsequently extended to April 28, 1964.

On March 7, 1964, codefendant William Freeman sent a cable from New York City to Mr. and Mrs. Marcantoni informing them that the aforesaid codefendant, Freeman, was the sole stockholder and principal officer of coplaintiff Cariblantic Realty Corp. which was ready to take title to the properties involved in the contract of October 31, 1963, and fixing March 18, 1964, and the office of Attorney José Antonio Luiña as the time and place to close the business; at the same time, on March 11, 1964, coplaintiff Cariblantic Realty Corp. authorized coplaintiff Herbert S. Werner to send to Mr. and Mrs. Marcantoni a communication informing them that the date, time, and place for the closing of the business agreed upon, would be Monday, March 23, 1964, at 10 a.m. in the law offices of McConnell, Valdés & Kelley. As is readily seen, codefendant Freeman required Mr. and Mrs. Marcantoni to sell to him, on March 18, 1964, as sole stockholder, the property involved in the contract of October 31, 1963, and coplaintiffs Herbert S. Werner and Robert Berk required that they be sold, on March 23, 1964, as sole stockholders, the same property. On the other hand, the possibility existed that the controversy among the parties could not be settled prior to April 28, 1964, and that the contract to sell became ineffective.

It is for this reason that on March 15, 1964, in a motion to secure effectiveness, plaintiffs moved for an order addressed to each and every one of the defendants to desist and abstain from carrying out any transaction, regardless of its nature, in connection with the lands involved in the controversy, and ordering them specifically to desist and abstain from executing any necessary document regarding the purchase and sale of the lands, which order was issued as requested, that same day, March 15, 1964. As a matter of curiosity, it should be stressed that in the answer to the complaint filed by codefendant Freeman on April 8, 1964, the Court is informed that on March 13, 1964, that is, two days before moving for the order to secure effectiveness, and in New York City, Cariblantic Realty Corp. had conveyed to Mr. Fredic Gould, by endorsement, the option to sell contract above referred to.

Subsequently, sensing the possibility that April 28, 1964, would elapse without the right to acquire the lands having been completely settled, plaintiffs moved for the appointment of a Receiver and April 20, 1964, was set to hear the parties concerning this request. After hearing the parties, on April 21, 1964, the trial court ordered the appointment of a Receiver, designated Mr. Roberto J. Matos as such Receiver, and instructed him, among other things, to notify codefendants Mario Marcantoni and his wife Gladys Massanet Marcantoni, of the date, time, and place to close the business agreed to in the Option to Sell Contract of October 31, 1963; to appear on said date, time, and place on behalf of Cariblantic Realty Corp. to execute whichever documents were necessary in order to consummate the business agreed to; to receive on behalf and in representation of Cariblantic Realty Corp., from the hands of coplaintiffs Herbert S. Werner and Robert Berk, the sum of $135,000.00 and to pay said sum to Mr. and Mrs. Marcantoni; to take possession of the properties thus acquired, all of it subject to further order of the Court, with

the understanding that the properties would remain in "custodia legis" subject to any further determination deemed proper by the Court with respect thereto.

In addition, the order of receivership has two other provisions: (1) "It is expressly provided that, should codefendants Mario Marcantoni and his wife Gladys Massanet Marcantoni refuse to convey the properties in question in the manner above provided, the conveyance shall be carried out on the date, time, and place designated by the Receiver, by the Marshal of this Court, who is hereby authorized to make said conveyance on behalf and in representation of the sellers, Mario Marcantoni and his wife Gladys Massanet Marcantoni, all of it pursuant to the terms, clauses, covenants, and conditions of the Option to Sell Contract." (2) "It is expressly provided that the conveyance of the properties on behalf of Cariblantic Realty Corp. hereby ordered, shall be subject to any right established before the Court by any third person who may have validly acquired, by assignment on the part of Cariblantic Realty Corp., the latter's rights with respect to the Option to Sell Contract of October 31, 1963. If this Court should determine after hearing the parties that a particular third party acquired the rights of Cariblantic Realty Corp. in the aforesaid Option to Sell Contract, the Court shall then order the Receiver to convey the aforesaid properties to such third party, and the Court shall take whichever additional measures may be proper in law for the protection of the parties and the final disposition of the case."

When Mr. Marcantoni and his wife refused to close the business as requested and to convey the properties, the Marshal of the Superior Court of Puerto Rico, San Juan Part, proceeded to make the conveyance on behalf of Mr. and Mrs. Marcantoni in favor of Cariblantic Realty Corp., in accordance with deed No. 5 of April 24, 1964, before Notary Mr. Ramón Morán Loubriel.

On April 27, 1964, codefendant William Freeman, petitioner herein, filed in this Court a petition for certiorari to review the order of April 21, 1964, ordering the receivership, on the following grounds: (1) because said order had been issued without giving plaintiff an opportunity to introduce evidence; (2) because the appointment of a Receiver is erroneous inasmuch as petitioner had and still has some other adequate remedy in law; (3) because no possibility was shown to exist to the effect that plaintiffs would prevail; (4) because that order is erroneous insofar as it orders the Receiver to take possession of a property, title to or possession of which is not in issue in the complaint filed by plaintiffs.

1. After issuing the writ and thoroughly examining the entire procedural question as the same appears from the record of the trial court, we agree that to order a receivership in order to take certain actions that are hard to settle in the peremptory period of time fixed in the contract of October 31, 1963, was a reasonable manner of protecting the rights of the three parties concerned. We lack the necessary background to make a determination with respect to the denial of the Judge to hear evidence before ordering the receivership. As a matter of fact, when on April 20, 1964, the parties were heard regarding the advisability of the receivership, codefendant Freeman had already informed the Court in his answer filed April 8, 1964, that on March 13, 1964, and in New York City he had conveyed to Mr. Fredic Gould, by endorsement, any rights he might have had in the Option to Sell Contract.

2–3. It is true that the appointment of a receiver, within a petition to secure the effectiveness of a judgment, is at all times a remedy to be handled with the utmost care, above all with respect to the damage that such remedy might cause to an adverse interest: *Ramírez* v. *District Court*, 64 P.R.R. 507, 513–516 (De Jesús) (1945). Nevertheless, when circumstances indicate that a certain state of fact or of law

favorable to all parties concerned may be obtained through the transfer of authority and direction of a business creating a receivership, such remedy is at the disposal of judicial discretion. The fact that in the contract of October 31, 1963, coplaintiff Herbert S. Werner should appear as sole agent of Cariblantic Realty Corp. gives way to the inference that plaintiffs will prevail and be declared the only parties in interest, insofar as the rights originating the Option to Sell Contract of October 31, 1963, are concerned.

4. The right to exercise the option in the manner agreed upon in the contract of October 31, 1963, is by itself a controversy regarding an ownership right, of a real nature although subject, as to consummation, to previous judicial determination. The remedy adopted by the trial court is correctly inspired on the aim of maintaining available the right of ownership pending the controversy as to who are the real parties in interest as stockholders, managers, or agents of the corporation.

The writ issued April 27, 1964, should be discharged and the order issued in aid of our jurisdiction, set aside.